

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ronald A. Guzman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 752 | **DATE** | 3/27/2002 |
| **CASE TITLE** | DAWN C. SANCHEZ vs. COMMONWEALTH EDISON CO. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] ComEd's motions to strike are denied in part and granted in part [43-1, 44-1] and ComEd's motion for summary judgment is granted [28-1]. Plaintiff's objections to Magistrate Judge Keys Report and Recommendation are overruled and her motion to amend her Final Pretrial Order denied [61-1]. All other pending motions are stricken as moot. The Clerk of the Court is directed to enter judgment is favor of ComEd and against Plaintiff Dawn Sanchez, dismissing Plaintiff's cause of action with prejudice. This is a final and appealable order. Enter Memorandum Opinion and Order.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | Document Number |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | MAR 2 8 2002 date docketed | 68 |
| | Notified counsel by telephone. | | |
| ✓ | Docketing to mail notices. | | |
| ✓ | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | |
| CG | courtroom deputy's initials | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| DAWN C. SANCHEZ, ) | |
| ) | DOCKETED |
| Plaintiff, ) | MAR 2 8 2002 |
| ) | |
| v. ) | |
| ) | No. 00 C 752 |
| ) | |
| COMMONWEALTH EDISON CO., ) | |
| ) | Hon. Ronald Guzman |
| ) | |
| Defendant. ) | |
| ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Dawn C. Sanchez brings this action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"), against her employer, Defendant Commonwealth Edison Co. The parties have filed the following motions: Defendant's motion for summary judgment pursuant to Fed. R. Civ. P. 56; Defendant's motion to strike numerous paragraphs of Plaintiff's Local Rule 56.1 Statements of Material Facts; Defendants Renewed motion to strike these same paragraphs of Plaintiff's Local Rule 56.1 statements in light of Magistrate Judge Keys Report and Recommendation dated September 18, 2001; Plaintiff's motion to Amend her Pretrial Order pursuant to Fed. R. Civ. P. 16; and Plaintiff's objections to Magistrate Judge Keys Report and Recommendation. For the reasons set forth below Plaintiff's objections to Magistrate Judg Keys Report and Recommendation are overruled and her motion to amend her pretrial order denied. Defendant Commonwealth Edison's motions to strike are granted in part and denied in part and



Commonwealth Edison's motion for summary judgment is granted.

## FACTUAL BACKGROUND

The facts are taken from the parties' statement of facts pursuant to Local Rule 56.1. Defendant Commonwealth Edison Company ("ComEd") hired Plaintiff Dawn C. Sanchez ("Plaintiff or Sanchez") in 1976. In 1978, ComEd promoted Sanchez to the position of Radiation Protection Technician ("RP Tech") at ComEd's Dresden Nuclear Power Plant facility ("Dresden"), the position which she holds today. (Cmplt.,¶ 8). Plaintiff's duties as an RP Tech include a variety of tasks related to radiation exposure, which are assigned to Plaintiff on a daily basis and are based on job needs.

Plaintiff's first-line RP Supervisors at Dresden have changed over the last two years. The persons to whom Plaintiff reported at various times during this period are: Dan Doggett, Dave Van Aken, Rick Conklin, Harry Bush, Mike Overstreet, Joe Ferguson, Bob Norris, and Bill Painter (Sanchez, Tr. 8-13). Plaintiff reported directly to these first-line supervisors, although not all of them at the same time. (Sanchez, Tr. 8, 11-12). The RP Supervisors report to the Department Head, John Moser. Moser's job title is Radiation Protection Manager. (Sanchez, Tr. 9-10).

John Hynes has been the Human Resources ("HR") Manager at Dresden since October 23, 2000. (Hynes, Aff. ¶¶ 1, 2). As HR Manager, Hynes is responsible for all HR activities at Dresden, including but not limited to, labor relations, employment and Equal Employment Opportunity Commission ("EEOC") matters. (Hynes, Aff.3). Prior to Hynes, Amy Best was the Human Resources Manager at Dresden. (Hynes, Aff. ¶ 2).

Dresden, like other Exelon nuclear generating stations, periodically schedules "outages" where one of the reactors is shut down to perform necessary maintenance, repair or refueling. (Swafford, Aff. ¶ 4). During outages, employees from one station may be temporarily assigned to the site conducting the outage in order to accommodate the need for additional manpower. (Hynes, Aff. ¶ 4). ComEd also

retains hundreds, even thousands, of additional contractors on site. (Sanchez, Tr. 42, 227, Hynes, Aff.¶ 4). During the Dresden 2000 outage, there were at least 1,200 contractors on site. (Sanchez, Tr. 226-7). Since 1999, Plaintiff has participated in two outages at Dresden station, one in Fall 1999 and one in Fall 2000. (Sanchez, Tr. 79).

Plaintiff also has spent brief periods of time at other ComEd facilities during outages. Plaintiff was at ComEd's Byron station for four weeks during a 1999 outage, and at the Braidwood station for three days during an outage in March of 2000. (Sanchez, Tr. 13-14, 31-33, 23 3-4). Plaintiff's first-line supervisor at Byron during the 1999 outage was Darris Palmer.

ComEd adopted a company-wide policy prohibiting sexual harassment that has been modified and republished over the years. It sets forth examples of prohibited behavior and includes a complaint mechanism. ComEd's sexual harassment policy directs employees to report complaints of alleged harassment to their Department Heads, HR. or the Corporate Services EEO Department ("Corporate Services/EEO"). This policy also contains the names and in-house phone extensions of the relevant HR personnel of the station, as well as the phone number for Corporate Services/EEO. ComEd's sexual harassment policy also emphasizes that employees who present a harassment complaint are assured a prompt and confidential investigation. It is undisputed that ComEd has distributed its sexual harassment policy three times in 1999 and 2000; on numerous occasions reminded employees and contractors of aspects of its harassment policy and independent contractors brought on site are trained on ComEd's harassment policy. (ComEd's 56.1¶ 58).

Sanchez is familiar with ComEd's sexual harassment policy. She is aware that upon encountering inappropriate behavior, an employee should "talk to [his or her] supervisors, HR. and go through the steps." Plaintiff also knows that complaints can be brought to Corporate Services/EEO. (Sanchez, Tr. 53-54). Separately, an employee who discovers a work-related problem can submit a

3

Problem Identification Form ("PIF"), now known as a Condition Report ("CR"). The PIF/CR is forwarded to the employee's supervisor for review.

Plaintiff alleges that she was subjected to pervasive discrimination and harassment during her tenure at ComEd. Plaintiff alleges that her male co-workers and supervisors have engaged in "foul and abusive language." Plaintiff complains of the following incidents of foul and abusive language at the Dresden station:

(a) In May of 1999, Bob Norris, one of Sanchez' supervisors at Dresden, was upset with the general foreman, Dan Doggett, and said within Sanchez' hearing, "Is Dan just F'ing stupid or is he a F'ing idiot." (Sanchez, Tr. 80). Norris did not specifically direct this statement at Sanchez. (Sanchez, Tr. 80). Sanchez reported the comment to Doggett, and in response, Doggett reprimanded Norris for his use of profanity. Norris subsequently apologized to Sanchez (Sanchez, Tr. 80-81).

(b) During the 1999 outage, Sanchez heard foul language while working at the RP desk. (Sanchez, Tr. 84-86). The only instance of profanity Sanchez recalls in particular was an incident where a group of contractors were locked out and one of the contractors stated "I have to get my F'ing guys to F'ing work right now." (Sanchez, Tr. 85-86, 171-173). Total, Sanchez believes she heard foul language four or five times while working the desk during this outage. (Sanchez, Tr. 174). The profanity Sanchez heard during this outage was not specifically directed at her, but rather was said because the contractors "were very anxious" and "wanted to get their people back to work." (Sanchez, Tr. I 73). Sanchez cannot specifically recall hearing any ComEd <u>employees</u> who used profanity during this outage. (Sanchez, Tr. 175).

(c) In January of 2000, an unidentified engineer, not an employee in Sanchez's department, was in a hurry and became frustrated when he had to wait at the exit point for 10 —15 minutes in order to allow the nuclear decay to dissipate. His frustration was directed at Sanchez because she was the one working that area. When he finally was allowed through the decay monitor, he dropped some coins onto the floor, and not wanting to delay any longer, said "F--- it." Sanchez reported this incident to her supervisor, and the engineer was "coached" on appropriate behavior. (Sanchez, Tr. 24-27, Ex. C). Several months later in September of 2000, this same engineer, when standing with visitors at the RP desk where Sanchez worked, told his visitors who were reading the Radiation Work Permit, "You don't need to read all that shit." Immediately after making this comment, the engineer said to Sanchez, "Oops, I wasn't supposed to say that, was I." (Sanchez, Tr. 27-28).

(d) During the 2000 outage, Sanchez worked the R.P desk. From this position, she could

4

see the exit point of the Decontamination room ("Decon room"). There were two days during this outage when an unusually large number of employees and contractors were contaminated with nuclear decay, which significantly slowed the process at the exit point and resulted in lengthy lines. (Swafford, Aff ¶ 7). Combined with these long lines, individuals were "hot, thirsty [and] tired." (Sanchez, Tr. 99). During this time, Sanchez heard profanity from contractors who were forced to endure lengthy waits in line to exit. (Sanchez, Tr. 104-105, 111). Sanchez complained to her supervisor, Van Aken. In response to her complaints, Van Aken reprimanded the individuals using profanity. (Sanchez, Tr. 137-138). He also would "step in" to help Sanchez in the room when necessary. (Sanchez, Tr. 113-114). Four days later, Sanchez filed a CR regarding the language she overheard in Decon room during this outage. (Sanchez, Tr. 104, 111, Ex. D).

(e)  During the 2000 Dresden outage, Sanchez overheard Norris say to one of the RP Techs that he was "F'ing tired" of the Tech's "whining." Sanchez admits, however, that this comment was not said in front of her and that Norris likely did not even know that Sanchez was present. Norris has not engaged in any other inappropriate behavior in front of Sanchez. (Sanchez, Tr. 82-83).

Sanchez states that she also heard foul language when she worked at the Byron and Braidwood stations during outages. Sanchez could not recall any of the names of the employees from whom she heard such language, but stated she did not hear profanity from her Byron supervisor, Darris Palmer, nor the RP Department head, Scott Fletcher. (Sanchez, Tr. 34). Sanchez did not complain about the foul language to any Department Heads, Byron HR. or Corporate Services/EEO. (Sanchez, Tr. 65-68, 235-8). Sanchez also did not file a PIR/CR regarding the profanity she heard at Byron. Plaintiff, however, cannot recall any instance where such language was targeted at her because of her gender. (Sanchez, Tr. 111-113). When asked why she didn't complain, Sanchez testified she "didn't have time." (Sanchez, Tr, 68).Plaintiff's male co-workers and male supervisors have also heard profanity. (Sanchez, Tr. 137-138, Massey, Tr. 11-13, Phillips, Tr. 20, Ferguson, Tr. 21-22, Uremovic, Tr. 13-14). People use such language because they are "hot and sweaty and trying to get out of the plant." (Uremovic, Tr. 14).

5

## (B) Graffiti, Pictures, T-Shirts and Other Sexually Offensive Materials

Sanchez reported several pieces of sexually offensive graffiti, pictures and other materials. Sanchez testified that at Byron during the 1999 outage, she found some pictures of nude women in a garbage can in the breakroom. Sanchez reported these pictures to her supervisor, who removed the pictures and apologized to Sanchez, saying he was "really sorry" the pictures were there. (Sanchez, Tr. 47- 49.) Sanchez did not see any other sexually explicit pictures at Byron, Braidwood or Dresden during this two-year period. (Sanchez, Tr. 48).

Sanchez also complains about "centerfold" type pictures in the men's locker room. (Sanchez ¶ 92-103). Photographs of "half-naked women on a boat" were distributed through "populated areas of the facility"(Sanchez's 56.1 Statement, ¶ 92-103). "Tool" calenders with scantily clad women pervaded the station. (Sanchez's 56.1 Statement ¶ 92-103).

At Dresden during the 1999 outage, Plaintiff found two inappropriate jokes on the breakroom table. Sanchez turned in both of these jokes to her supervisor, Doggett, who took the jokes to HR. (Sanchez, Tr. 148-152, Ex. E). Sanchez feels that Doggett took these jokes seriously. (Sanchez, Tr. 151). Doggett told Sanchez that the jokes would be treated like graffiti, and that he was disturbed that the jokes had been left out. (Sanchez Tr. 152, Ex. E). Sanchez has not heard or seen any other sexually offensive jokes. (Sanchez, Tr. 167). Sanchez does not remember hearing any comments about her gender, nor any gender specific words, comments, innuendoes, or derogatory terms. (Sanchez, Tr. 113).

Sanchez also alleges she has witnessed sexually explicit graffiti in the work environment: (Cmplt. ¶ 14).

- (a) Byron: Sanchez saw some graffiti on the walls and on the elevators. This graffiti consisted of pictures of "body parts of females," and in one instance the graffiti said "Tim Ivey sucks Crazy Mary's pussy." (Sanchez, Tr. 43-45). Every time Sanchez

6

reported the graffiti to Palmer, her supervisor, "somebody came down right away and painted over [it]." (Sanchez, Tr. 43-44).

- (b) Dresden: Sanchez reported graffiti at Dresden three times. (Ex. G). Each time, she wrote a PIE and in response, Tom Quinn, Contamination Control Supervisor, and his staff laborers promptly removed the graffiti. (Sanchez, Tr. 152, 157-158, Ex. G). One of the incidents reported by Sanchez involved graffiti that was etched into the mirror wall of the elevator. In response, the station laborers "went and emery boarded it off." (Sanchez, Tr. 158).

- (c) Braidwood: during the 2000 outage, Sanchez saw two small drawings of women's bodies in the containment area. She did not report these drawings to anyone. (Sanchez, Tr. 234-236). Sanchez also saw drawings and sexual language on hard hats. She did not report the graffiti on the hard hats to anyone in ComEd management. (Sanchez, Tr. 236-238).

Jackie Smith, Plaintiff's co-worker, testified that there has been very few sexually explicit drawings at work since 1999. (Smith, Tr. 6-7). ComEd "did a big sweep to try to clean up," thus, "you'd have to go in some pretty obscure places now to find them." (Smith, Tr. 6-7, Quinn, Aff. ¶ 7). ComEd also put up carpeting on the elevator walls to keep people from writing on them. (Ferguson, Tr. 10).

Sanchez alleges she has seen four contractors wearing inappropriate t-shirts:

- (a) At Byron during the 1999 outage, Sanchez saw one "Big Johnson" t-shirt worn by a contractor. "Big Johnson" t-shirts have some sexual innuendo. Sanchez reported this t-shirt to her supervisor after the contractor had left the area, but was not able to identify the contractor by name. (Sanchez, Tr. 40-42).

- (b) At Dresden during the 1999 outage, Sanchez saw one contractor wearing a t-shirt with the words "Turkey Testicle Festival" written on it. (Sanchez, Tr. 87-90). Also during this outage, she saw a contractor wearing a "Big Johnson" t-shirt. (Sanchez, Tr. 90-91). Sanchez did not report these incidents to anyone, nor did she file a PIE/CR.

- (c) During the Dresden 2000 outage, Sanchez witnessed one contractor wearing a "Big Johnson" t-shirt. (Sanchez, Tr. 91-92, Ex. H). Sanchez promptly identified this shirt to her supervisor, who directed the contractor to turn his t-shirt inside out. (Sanchez, Tr. 91-92, Ex. H).

**(C) Violations of ComEd's Modesty Garment Policy**

7

Sanchez also alleges she witnessed violations of ComEd's modesty garment policy. (Cmplt. ¶ 19). Modesty garments are clothing, typically t-shirts and shorts or scrubs, that are worn under the protective clothing required in high radiation areas. (Hynes, Aff ¶ 8). The modesty garment policy states that modesty attire may be donned only at designated locker or change areas or in private rooms controlled by the individual using the area. (Hynes, Aft. ¶ 8).

In Sanchez's own words, Byron adheres to the modesty policy "pretty close." (Sanchez, Tr. 74). On three or four occasions, however, Sanchez saw men wearing "Speedo" shorts under their protective clothing instead of scrubs or shorts. (Sanchez, Tr. 74-75). Sanchez believes these individuals were contractors. (Sanchez, Tr. 74). Sanchez did not see any violations of the modesty garment policy at Dresden during the 1999 outage. (Sanchez, Tr. 129-130).

During the Dresden 2000 outage, Sanchez saw contractors changing out of their protective clothing outside of the locker room. Because of an equipment problem causing a greater number people to be contaminated, the lengthy lines became even longer. Individuals were not able to immediately get inside the shower room, and lines formed outside. (Sanchez, Tr. 95-98, Swafford, Aft. ¶ 7). Sanchez also alleges that because of the continual procession of people opening the door as they entered the shower room, the door to the shower room was rarely completely shut. (Sanchez, Tr. 95-98).

Sanchez filed a CR on September 26, 2000, titled "Decon room contamination's events" objecting to this behavior that, according to her own words, occurred on September 21 and 22, 2000. In her CR, Sanchez complained about the "anger and inappropriate language" of the individuals waiting to change out of their protective clothing. Sanchez did not allege that she had personally witnessed any violations of the modesty policy. (Ex. D). Sanchez's supervisor. Van Aken, reviewed this CR and proposed the following solution: "To expedite workers coming out of the RPA, showers

8

added at the D3 exit would help also racks at the D2 exit for scrubs and operate the second shower." (Ex. D).

Sanchez does not allege any violations of the modesty garment policy while at Braidwood during its 2000 outage. (Sanchez, Tr. 224-225).

### (D) Comments Derogatory to Women

Sanchez further complains that much of the common place banter to which she is exposed includes jokes and comments, which were derogatory towards women, including but not limited to, comments that women do not belong at ComEd/Exelon's Dresden facility because they do not work as hard as men, and derogatory comments about sexuality of the women employees at the facility. (Sanchez's 56.1 Statement ¶ 101-102). Sanchez claims that these comments were typically started by management (Id.).

Finally, Sanchez complains that she was stigmatized harassed, mocked and ridiculed for her efforts to confront and report the hostile and offensive environment within which she had to work. (Sanchez's 56.1 Statement ¶ 67, 68, 72, 140). Sanchez was referred to as a "complainer" and others quit complaining about the work environment because they perceived it to be a waste of time and distressing. (Sanchez's 56.1 Statement ¶ 73-77, 83-84, 92-105). Furthermore, it was generally known throughout the facility that the actual directive from management to employees was to "watch what you say" around Sanchez rather than "conform your workplace conduct to the requirements of the sexual harassment policy." (Sanchez's 56.1 Statement, ¶ 73-140)

### (E) PLAINTIFF'S ALLEGATIONS OF RETALIATION

In her complaint, Sanchez alleges she was "selected to be one of the members of a sexual harassment committee formed in 1997," and that she "was derided by management personnel and employees in retaliation for her involvement on the sexual harassment committee and because Sanchez

was instrumental in having published in the ComEd'S newsletter a sexual harassment awareness notice and requiring employee signatures to attest to their awareness of Defendant's policies and procedures regarding sexual harassment and hostility in the workplace." (Cmplt., ¶¶ 26, 27).

The allegations mentioned in Sanchez' Complaint that <u>are</u> a part of her retaliation claim in this lawsuit are as follows:

(a) "Defendant's employees have discussed with other Defendant's employees the Sanchez's previous lawsuit against Defendant and in those discussions have told other co-workers that 'everyone should watch what they say around her.'" (Cmplt. ¶ 28);

(b) "Defendant's employees have spread rumors about Sanchez that 'she had better be perfect around them' implying they would engage in vexatious retributory actions towards the Sanchez otherwise." (Cmplt. ¶ 29);

(c) "Defendant's employee attempted to intimidate her by commenting 'whatever Lola wants Lola gets,' when Sanchez reported finding sexually offensive language scribbled on an elevator wall at Defendant's plant." (Cmplt. ¶ 30); and

(d) Sanchez has "suffered an act of vandalism" in retaliation against her "efforts to address the hostile work environment." (Cmplt.¶ 32).

Although not stated in her Complaint, Sanchez testified at her deposition she has not been allowed to take an instrumentation class she would like to attend. In late 2000, when asked by their supervisor if they would like to take the class, Sanchez and another RP Tech, Don Jonen, (male), responded they were interested in doing so. Sanchez and Jonen transferred to Unit One, however, before they had an opportunity to take the class. They were subsequently notified by their supervisor that while at Unit One, there was no need for them to take the instrumentation class, and they subsequently would not be able to take it. (Sanchez, Tr. 19-23).

Sanchez would not make more money even if she had taken the instrumentation class, nor would her job responsibilities change. (Sanchez, Tr. 20-21). Sanchez testified at her deposition that she does not allege she has lost any work-related opportunities other than the instrumentation class.

(Sanchez, Tr. 23).

Contrary to the allegations in Paragraph 33 of the Complaint, Sanchez admitted at her deposition that she has not experienced any loss of income or benefits since her prior lawsuit. (Sanchez, Tr. 23-24). Sanchez also admits that none of the acts of "retaliation" alleged by Sanchez have in any way affected Sanchez's pay, nor her job title, nor her position, nor any term or condition of her employment. (Sanchez, Tr. 199-200).

On November 2, 1999, Plaintiff filed a charge of discrimination with the EEOC. The EEOC issued a notice of right to sue one week later on November 10, 1999. Plaintiff filed this lawsuit on February 7, 2000. On October 31, 2000, Plaintiff filed another EEOC charge, and the EEOC issued a notice of right to sue two weeks later on November 14, 2000. Plaintiff filed her First Amended Complaint on January 2, 2001.

## DISCUSSION

### I. Plaintiff's Motion to Amend Her PreTrial Order.

Plaintiff has filed untimely objections to Magistrate Judge Keys Report and Recommendation. Federal Rule of Civil Procedure 72(a) provides that a party must object to a ruling by the magistrate judge within 10 days after being served with the magistrate judge's order. Magistrate Judge Keys issued his order on September 18, 2001 and Plaintiff filed her objections on November 6, 2001. Thus, these objections are deemed untimely. Even if such objections were in fact timely they are overruled in light of Magistrate Judge Keys' thorough and well-reasoned order.

### II. Defendant's Motion to Strike Paragraphs in Plaintiff's 56.1 Responses.

Commonwealth Edison has moved to strike certain paragraphs of Plaintiff's 56.1(b)(3)(A)

11

responsive statement and certain paragraphs of Plaintiff's LR 56.1 (b)(3)(B) statement of additional facts. The court grants the motion to strike paragraphs 25, 28, 29 in part, 31-33, 35, 37, 40-43, 46, 48, 58, 62, 66, 69 and 72 of Plaintiff's L.R. 56.1 (b)(3)(A) statement for failure to comply with that rule. These are judicial admissions and Plaintiff has no substantive basis to support her denial of these facts. For the same reasons, the court strikes paragraphs 73, 108-110, 117, 122-133, 137, 138 and 140 of Plaintiff's 56.1(b)(3)(B) statement.

### III. Hostile Work Environment Claim.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issues as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment carries the initial burden of demonstrating an absence of evidence to support the position of the non-moving party. *Doe v. R.R. Donnelley & Sons, Co.*, 42 F. 3d 439, 443 (7th Cir. 1994).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to" set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson*, 477 U.S. at 256. Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."Fed. R. Civ. P. 56. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

Finally, the court notes that summary judgment is not "a disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination

of every action." *Celotex*, 477 U.S. at 327. With these principles in mind we turn we address the parties' arguments.

Title VII prohibits an employer from "[discriminating] against an individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's...sex." 42 U.S.C. § 2000e-2(a)(1) (1994). Sexual harassment is actionable under Title VII only if it is "so severe or pervasive as to alter the conditions of [the victim's] employment and create an abusive working environment." *Hostetler v. Quality Dining, Inc.*, 218 F. 3d 798, 806 (7th Cir. 2000). In order to establish a *prima facie* case of hostile environment sexual harassment, a plaintiff must show that: (1) he was subjected to unwelcome sexual harassment in the form of sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature; (2) the harassment had the effect of unreasonably creating an intimidating, hostile or offensive working environment that affected seriously the psychological well-being of the plaintiff; and (4) there is a basis for employer liability. *See Parkins v. Civil Constructors of Illinois, Inc.*, 163 F. 3d 1027, 1032 (7th Cir. 1998) *citing Renne v. Dalton*, 3 F 3d 1100, 1107 (7th Cir. 1993). Whereas other disparate treatment claims may scrutinize discrete harms such as hiring or discharge, a hostile work environment claim analyzes a workplace environment as a whole to discover whether it is "abusive." *Harris v. Forklift*, 510 U.S. 17, 22, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1983); *see also Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64, 106 S. Ct. 2399, 91 L. Ed. 49 (1986).

Under the law of the Seventh Circuit, the impact of the harassment upon the plaintiff's work environment is measured both objectively and subjectively. The work environment cannot be described as "hostile" for purposes of Title VII unless a reasonable person would find it offensive and the plaintiff actually perceived it as such. *Id.* (citing *Faragher v. City of Boca Raton*, 524 U.S. 775,

13

787-88, 118 S. Ct. 2275, 2283, 141 L. Ed. 2d 662 (1998)). The harassment must be sufficiently severe that a rational trier of fact could find that it had actually changed the conditions of the plaintiff's workplace. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S Ct. 2399, 91 L. Ed. 2d 49 (1986). These factors are evaluated not only from the plaintiff's subjective view, but also from a reasonable person's objective view. *Harris v. Forklift Systems, Inc.*, 510 U.S.17, 21, 114 S. Ct. 367 (1993). The Seventh Circuit has observed that drawing the line between unpleasant work behavior and actionable objectively hostile work environment is not always easy. "On one side lie sexual assaults; other physical contact, whether amorous or hostile, for which there is no consent express or implied; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures; pornographic pictures. On the other side lies the occasional vulgar banter, tinged with sexual innuendo, of course or boorish workers." *Meritor* at 61.

While there is evidence that Sanchez was subjected to off-color or sexually suggestive comments and conduct that made her working environment uncomfortable (thus satisfying at least two of the elements of her *prima facie* case), we are nevertheless compelled to grant summary judgment to ComEd because there is no evidence supporting a basis of employer liability. As the Seventh Circuit has explained, an employer's "liability for hostile environment sexual harassment depends upon whether the harasser is the victim's supervisor or merely a co-employee." *Faragher v. City of Boca Raton*, 524 U.S. 775, 794, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998). If the harasser is a supervisor and the victim suffered a tangible employment action, then the employer is strictly liable, although there is the possibility of an affirmative defense. *Id.* However, because employers do not "entrust co-employees with any significant authority with which they might harass a victim, employers are liable for a co-employees harassment only 'when they have been negligent either in discovering or

remedying the harassment.'" *Id.*

It is undisputed that the alleged harassment Sanchez complains of was made by coworkers. An employer's legal duty in co-employee harassment cases will be discharged "if it takes reasonable steps to discover and rectify acts of sexual harassment by its employees." *Id.* In determining whether an employer had notice of harassment, a district court must determine whether the employer has "designed a channel for complaints of harassment." *Id.*

ComEd has presented sufficient evidence that it took reasonable steps to discover, rectify and address known complaints of sexual harassment. It is undisputed that the profanity Plaintiff overhead was in some instances immediately addressed by supervisors if the supervisor overhead it or was made aware of it. In one supervisor overhead this comment and without a complaint from Plaintiff immediately reprimanded the employee. On one occasion at Byron, Plaintiff found pictures of nude women in a breakroom garbage can, and her supervisor immediately removed them. At Dresdon she found two inappropriate jokes on the bathroom table, and her supervisor immediately took the jokes to Human Resources. Plaintiff testified as to three four instances of graffiti and offensive t-shirts worn by contractors but the record is reveals that ComEd has issued policies and training with respect to this graffiti over the years. ComEd even carpeted the elevators to prevent the reoccurence of such.

Futhermore, these handful of relatively infrequent and distasteful comments and conduct Plaintiff experienced, spread over a two-year period, cannot be concluded to rise to the level of an environment that violates Title VII. More specifically, while the comments that co-workers made were crude and ignorant, they were not "so objectively offensive as to the alter the conditions of the victim's employment."

Plaintiff allegations with respect to violations of the the modesty garment policy are also

15

insufficient as a matter of law. These complaints stem almost entirely from a few particularly difficult days during the Dresdon 2000 outage, where Plaintiff allegedly witnessed people changing out of their protective clothing in the waiting room instead of the shower room because of the contmination. Plaintiff did not see anybody nude rather she saw individuals in their scrubs or underwear.

Plaintiff admits that ComEd took remedial steps in response to her complaints and acknowledges ComEd's general efforts as to implementation of its anti-harassment policies. These efforts certainly seem sufficient and can only be concluded to be calculated to end the harassment. *See, Saxton v. AT&T,* 10 F. 3d 526, 535 (7th Cir. 1993). Therefore, we will grant summary judgment because we find that ComEd took reasonable care and repeated steps to prevent sexual harassment and to provide a meaningful process whereby an employee can express his or her concerns regarding an individual within a working environment.

**IV. Retaliation Claim.**

In order to survive summary judgment on her retaliation claim, Sanchez must show that 1) she engaged in a statutorily protected expression; 2) she suffered an adverse employment action by her employer and 3) there is a causal link between the protected activity and the adverse action. *Sweeney v. West,* 149 F. 3d 550, 555 (7th Cir. 1998). To establish a causal link plaintiff must show that defendant would not have taken adverse action "but for" the protected expression. *Klein v. Trustees of Indiana Univ.,* 766 F. 2d 275, 280 (7th Cir. 1985). Causation must be proved in its own right; its existence cannot be bootstrapped from the existence of the other two elements. *Klein* at 280.

Plaintiff claims that ComEd engaged in the following adverse actions in retaliation for her complaints about the work environment: (1) on two occasions, a ComEd employee said that people should watch what they say around Plaintiff; (2) one of Plaintiff's co-workers at Bryon stated "if

16

[Plaintiff] had a lawsuit, then [she] had better be perfect; (3) Tom Quinn, Contamination Control Supervisor, stated "Whatever Lola wants, Lola gets" in response to one of Plaintiff's reports to graffiti; (4) Plaintiff's car was scratched in later 1998 or early 1999; and (5) she was unable to take an instrumentation class.

Plaintiff's retaliation claim is primarily based on allegations of co-workers derision and disrespect. She admits that her supervisors have not engaged in retaliation. Furthermore ostracism and shunning by other employees is not sufficient to amount to an adverse employment action. *See, i.e. Robinson v. Honeywell Microswitch Div.*, No. 98 C 50277, 2001 WL 13257 at *9 (N.D. Ill.Jan 3, 2001)(supervisor's ignoring of and "turning her nose up" at plaintiff did not constitute adverse employment actions within meaning of Title VII). Even if such statements could be considered in summary judgment, they clearly are insufficient to constitute an adverse employment action. The Seventh Circuit has held that an adverse employment action is indicated by a termination of employment, a demotion evidenced by a decrease in wages or salary, a less distinguished title, a material loss of benefits, or assignment to a significantly lessor job. *See Hill v. American Gen. Fin., Inc.*, 218 F. 3d 639, 645 (7th Cir. 2000). The scratch of her automobile Plaintiff complains about has not been linked to ComEd. The instrumentation class that Plaintiff was not permitted to take subsequent to her transfer to Unit One fails to raise an issue of fact because Plaintiff's co-worker, Don Jonen, was similarly informed that he could no longer take the instrumentation class after he transferred. Nothing in the record indicates that this is not the standard practice. Finally, Plaintiff admits that her salary would be the same even if she had taken the instrumentation class even though there would have been more diversification as to duties. Therefore, ComEd is entitled to summary judgment on Sanchez's retaliation claim.

## CONCLUSION

For the reasons set forth above ComEd's motions to strike are denied in part and granted in part (##43-1, 44-1) and ComEd's motion for summary judgment is granted (#28-1). Plaintiff's objections to Magistrate Judge Keys Report and Recommendation are overruled and her motion to amend her Final Pretrial Order denied. (#61-1). All other pending motions (##23-1, 24-1 25-1, 26-1, 32-1, 33-1, 33-2, 33-3, 45-1) are stricken as moot. The Clerk of the Court is directed to enter judgment in favor of ComEd and against Plaintiff Dawn Sanchez, dismissing Plaintiff's cause of action with prejudice. This is a final and appealable order.

**SO ORDERED**

ENTERED: 3/27/02

Hon. Ronald A. Guzman
United States Judge